J. A20004/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: Z.A.B., A MINOR: | IN THE SUPERIOR COURT OF |
| : | PENNSYLVANIA |
| APPEAL OF: E.B., MOTHER, : | |
| : | No. 3590 EDA 2013 |
| Appellant : | |

Appeal from the Order Dated November 13, 2013,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000366-2012,
CP-51-DP-0106043-2008

BEFORE: FORD ELLIOTT, P.J.E., MUNDY AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:　　　**FILED NOVEMBER 13, 2014**

Appellant, E.B. ("Mother"), appeals from the order entered in the Philadelphia County Court of Common Pleas, granting appellee's, Philadelphia Department of Human Services ("DHS"), petitions for goal change and involuntary termination of Mother's parental rights as to her minor child, Z.B. ("Child"). Upon a thorough review of the record and the applicable law, we affirm.

The relevant facts and procedural history of this case are as follows. DHS first became involved with the family on January 15, 2008, when it received a General Protective Services ("GPS") report which alleged that Child's older brother ("V.B.") smelled of urine, feces, and kerosene, was wearing unsuitable clothes for cold weather, and Mother had been

unresponsive to calls regarding V.B.'s appearance and education. The report was substantiated.

On February 7, 2008, the family began to receive Services to Children in Their Own Homes ("SCOH"). On February 14, 2008, Mother participated in an initial Family Service Plan ("FSP") meeting. The FSP permanency goal for Child, then age seven, was to remain in the home under supervision. The FSP objectives for Mother and Father with respect to Child were: (1) they were not to leave Child unattended or in the care of an irresponsible caregiver; (2) they would provide Child with nutritious meals, proper clothing, and make sure he was adhering to healthy hygiene directives; (3) they would obtain appropriate housing and correct housing hazards within their home; (4) Mother would undergo an evaluation for drug and alcohol abuse, and comply with all treatment recommendations; (5) Mother would achieve drug free status, to be verified by ten successful screens; (6) Mother would complete ten job applications or interviews; and (7) Mother would participate in a mental health evaluation and comply with all treatment recommendations.

In March 2008, SCOH provided Mother with information concerning three different programs where she could receive drug and alcohol treatment; Mother refused the referrals. On September 22 and 30, 2008, Mother tested positive for alcohol, and was referred by the Family Court Clinical Evaluation Unit ("the CEU") to St. Joseph's Hospital for inpatient

treatment. Mother did not comply with this referral. Consequently, on October 15, 2008, DHS filed an urgent petition to adjudicate Child dependent. Following an adjudicatory hearing on October 28, 2008, Child was adjudicated dependent, and the order provided that he reside with his maternal grandmother with SCOH services implemented there. The court also ordered that Mother be re-referred to the CEU for a drug screen and dual assessment, and ordered her to attend inpatient treatment as a result of the failed September screenings.

At a hearing on February 6, 2009, the court noted that Child had been residing with Father since January 9, 2009. The court noted a report of noncompliance by Mother from the CEU, and ordered Mother to comply with drug and alcohol treatment at the Wedge Medical Center ("Wedge") and that Wedge provide monthly reports regarding Mother's compliance. In July 2009, the court directed that Child remain with Father, ordered DHS to refer Child for in-home protective services, and further ordered that Child not have overnight visits with Mother. The court incorporated a CEU report of noncompliance by Mother with drug and alcohol treatment at Wedge, ordered Mother to comply with the program, and ordered Wedge to provide monthly reports and drug and alcohol screenings.

Child continued to live with Father until October 7, 2010, when the court found that Child was not safe there. The court ordered Child committed to DHS custody, and Child was placed that day through

Presbyterian Children's Village ("PCV"). Child was nine years old at the time. Mother and Father were granted separate unsupervised day visits. On November 19, 2010, the court held that Child's placement in foster care continued to be necessary and appropriate, and Child should remain in DHS custody.

After Child was committed to DHS, Mother's FSP goals included attending parenting classes, obtaining suitable housing, attending and completing dual diagnosis drug and alcohol and mental health treatment, and attending supervised visits. Although Mother completed parenting classes, she did not complete her other objectives. On June 20, 2011, Methodist Family Services of Philadelphia notified DHS that Mother's status in the Family Reunification Program for housing had been closed. Mother failed to complete her application even though she had been given three months longer than other candidates to do so. Additionally, Mother continued to reside with her paramour, A.C., despite failing to provide DHS with clearance information for him.

Mother continued to test positive for alcohol despite her intermittent attendance at drug and alcohol treatment. CEU reports noted that Mother tested positive for alcohol on 18 different occasions for the period starting on September 13, 2011, through November 16, 2012. During this time, Mother attended but did not complete treatment at Chances and Northeast Treatment Center ("NET"). DHS social work supervisor, Vivian Smalls,

testified that mental health treatment remained a concern because DHS had not received documentation that Mother successfully completed mental health treatment.

On July 17, 2012, DHS filed a petition for the involuntary termination of Mother's and Father's parental rights and to change Child's permanency goal to adoption. On December 11, 2012, a hearing on the petition took place. Counsel for Mother subpoenaed Child as a witness, and the parties argued as to whether and how Child should be questioned. The court ruled any questioning of Child would be performed by the court itself. The parties were directed to submit proposed questions for the court to ask Child, as well as to identify all witnesses and exhibits to be used in the case by January 11, 2013. The court further advised the parties that failure to timely comply would result in the inability to present unidentified witnesses or evidence.

At the hearing on January 23, 2013, Mother's counsel stated that he had just discovered five pages from PCV in DHS's file which allegedly had not been included in the materials provided to him by PCV in response to his subpoena. Counsel stated that he might need time to subpoena a witness from PCV concerning this material. DHS objected noting that the petition had been pending since July and that Mother had sufficient time to review both DHS' and the agency's files. The Child Advocate opposed any use of the documents as untimely. The court advised counsel that the proper

remedy would have been to contact the court rather than to ignore the deadline, and refused to grant a continuance.

DHS called Tyrone Robinson, Child's PCV caseworker from June 20, 2011, until January 15, 2013, his last day with PCV. Mr. Robinson arranged and supervised Mother's visits with Child during that time. Mother's visits occurred weekly for one hour and never progressed to unsupervised visits due to Mother's continued noncompliance with drug and alcohol treatment. Additionally, Mr. Robinson described Mother's attendance as "off and on," where she was late or confirmed visits and then failed to appear. During the period of April 14, 2011, until January 15, 2013, Mother attended only 48 of 87 visits that were offered.

DHS requested a continuance because its caseworker, Susan Copeland, was out on medical leave and the trial judge suffered an illness; the hearing reconvened on September 17, 2013. On September 17th, Ms. Smalls testified regarding the history of the case. Ms. Smalls indicated that Child has not lived with Mother for three years and Mother had not really parented him during that time. Ms. Smalls recommended the goal of adoption.

Elmyra Manigault, a DHS attorney charged with redacting Child's DHS file for privileged material prior to its production, appeared in response to a subpoena by Mother who demanded production of the original DHS file in the courtroom. Attorney Manigault testified that because of the confidential

nature of DHS files, those files were not removed from DHS offices. Attorney Manigault stated Mother's counsel had asked for and received copies of the pages he designated for copying.

At the final hearing on November 13, 2013, the trial court spoke with Child *in camera* in the presence of all counsel. Child's social worker was also present, but did not speak or engage in questioning. After examining Child in chambers, the trial judge returned to the courtroom with counsel and put a summary of Child's testimony on the record. Following closing arguments, the court concluded that DHS sustained its burden as to grounds for the involuntary termination of parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) of the Adoption Act. Regarding Section 2511(b), the court found that a Mother/Child bond did not exist. Mother filed a petition for reconsideration on November 25, 2013, that was denied. This appeal followed.[1]

Mother raises the following issues for our consideration:

[1.] Whether the trial court properly exercised its discretion in its enforcement of its pretrial discovery order[?]

[2.] Whether the trial court erred by overruling Mother's objection to allowing DHS to present the testimony of social work[er] supervisor Vivian Smalls[?]

[3.] Whether the trial court erred by failing to have the testimony of [Child] recorded[?]

---

[1] Father's parental rights were also terminated; he has not appealed that decision.

[4.] Whether the trial court erred by refusing Mother's CEU report of September 13, 2013 into evidence in her case in chief and by denying her attorney's request to call a witness to clarify the report's validity due to a prior erroneous report[?]

[5.] Whether the trial court erred by terminating Mother's parental rights[?]

Mother's brief at 1.

The first four issues raised by Mother relate to evidentiary rulings. Decisions regarding the admission or exclusion of evidence are within the sound discretion of the trial court, and this court will not disturb a trial court's evidentiary rulings absent an abuse of that discretion. **Fisher v. Central Cab Co.**, 945 A.2d 215, 218 (Pa.Super. 2008); **Commonwealth v. A.W. Robl Transport**, 747 A.2d 400, 404 (Pa.Super. 2000), **appeal denied**, 764 A.2d 1063 (Pa. 2000). An abuse of discretion is not merely an error of judgment; rather, it occurs where the judgment is manifestly unreasonable, where the law is not applied, or where the record shows that the action is a result of partiality, prejudice, bias, or ill-will. **Commonwealth v. King**, 959 A.2d 405, 411 (Pa.Super. 2008).

Mother's first argument relates to the trial court's pretrial discovery order. At the first hearing in this matter, Mother's counsel demanded to subpoena Child for questioning as a witness. The trial court denied this request citing that a child cannot be compelled to testify in a termination case. The court then set a deadline for the identification of all witnesses and

exhibits as well as questions for Child that the court would consider.  The court's December 11, 2012 discovery order required all counsel to submit their proposed list of questions for Child ten days prior to the termination and goal change hearing which was scheduled for January 22, 2013. Mother's attorney did not submit his list of witnesses or proposed questions for Child until January 14, 2013.  Counsel's letter listed suggested questions for Child and provided the names of the following witnesses:  Mother, Mother's paramour, A.C., and Child.  At no time did counsel inform the court that he would not be able to timely comply with the discovery order.  As a result, the trial court determined Mother's counsel's list of questions for Child was untimely, and determined Mother's paramour was not permitted to testify.

We begin our discussion by noting that Mother had no right to call Child as a witness in a termination of parental rights case.  **See In re: B.L.L.**, 787 A.2d 1007, 1014 (Pa.Super. 2001) (the testimony or preference of a child is not required or permitted in an involuntary termination proceeding, as the child cannot cede his right to minimal proper nurturing). As to A.C., DHS objected on the basis that he was untimely identified as a witness, and the court upheld the objection.  The record indicates that A.C. failed his background checks; therefore, Child could not live in the same house with him.  DHS argues that any testimony that A.C. may have offered would have been legally irrelevant.  The trial judge advised Mother's

counsel, "You know that we don't return children to homes where there is a person who has committed a prohibitive offense." (Notes of testimony, 10/29/13 at 37.) We find there is no merit to this first issue as the trial court's rulings were within its discretion.

In her second argument, Mother contends the trial court erred when it allowed the testimony of Ms. Smalls over Mother's objection. Specifically, Mother objected to Ms. Smalls' testifying solely from her review of DHS business records, *i.e.*, the DHS case file regarding Child, without producing the records in court "to enable counsel to determine if such records existed and to utilize them for cross-examination." (Mother's brief at 19.)

The record shows that Mother's counsel had the opportunity to review the redacted DHS file and receive photocopies of the contents of the file. (Notes of testimony, 9/17/13 at 27.) The DHS file is a confidential record and must be reviewed in the DHS offices. (*Id.* at 28.) Ms. Smalls testified as the supervisor of this case. (*Id.* at 41.) During her testimony, Mother's counsel continued to object. The trial court interjected:

> THE COURT: You [Mother's counsel] reviewed the record. [Ms. Smalls] is indicating that it is from the record. The record cannot be physically be brought here. Now, because the record cannot be brought here and because you have reviewed the record, if you feel and honestly you are stating to the court, that based upon your review and as an Officer of the Court, are indicating that this woman speaking under the business exception -- because I am going to allow her to testify because the physical record cannot be brought in -- but if you feel as an Officer of the Court that she is giving false information to

> this Court, perjuring herself, then I will stop this proceeding right now. Is that what you are saying [sic], after reviewing the record?
>
> MOTHER'S COUNSEL: That is not what I am saying. But we're not -- my argument goes to the competency of the testimony. Is she testifying from memory or is she testifying from records or from personal knowledge? That is not what is being made clear.
>
> THE COURT: I think it's clear she is testifying from her knowledge of the records. Ms. Mullen [DHS counsel], what is she testifying to? Let's make it clear on the record.
>
> MS. MULLEN: I believe she is testifying from her knowledge of the record as a Supervisor in this case. I can ask her the question.
>
> . . . .
>
> MS. MULLEN: Ms. Smalls, how are you aware that Mother has FSP objectives?
>
> MS. SMALLS: I reviewed the record, I talked to the previously assigned social worker, Ms. Coklin [sic], and I reviewed the case record and the notes.
>
> THE COURT: And is that person that you talked to, the person who was under your supervisory control?
>
> MS. SMALLS: Yes.

*Id.* at 50-52. Mother's counsel continued to object.

The Pennsylvania Rules of Evidence regarding business records provide as follows:

**Rule 803.   Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness**

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

**(6)   Records of a Regularly Conducted Activity.**   A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,

   (A)   the record was made at or near the time by--or from information transmitted by-- someone with knowledge;

   (B)   the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

   (C)   making the record was a regular practice of that activity;

   (D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

   (E)   neither the source of information nor other

- 12 -

> circumstances indicate a lack
> of trustworthiness.

Pa.R.E. 803(6).

Ms. Smalls' testimony related to records for Child within the DHS file that were maintained by Ms. Smalls' unit. However, it is clear that Ms. Smalls was not just a custodian of a record but was someone who had personal knowledge of the events as they occurred. The trial court summarized her role:

> THE COURT: I view that this woman is testifying in a dual capacity, sir, as the social work Supervisor familiar with the case, based upon her Supervisor's firsthand knowledge of this case, supervising the person who was there as the social worker, who is now out ill on disability, and the Court is taking that because she is familiar with the record, she is always testifying under the business exception. And the Court further takes note, for the record, that it is clear that the business record itself cannot be brought in, because of the central location.
>
> The court further takes note that Mr. Laikin, as attorney for the Mother, has indicated without any objection that he did review the entire record, except for those portions of the record that were redacted and is fully aware of all the information in the record.

Notes of testimony, 9/17/13 at 54-55.

We note Mother argues that certain documents referenced by Ms. Smalls, namely, supervisory logs which Ms. Smalls testified she kept as supervisor of the case, were not in the case file when her counsel examined it. (*Id.* at 41.) Both Ms. Smalls and DHS counsel, however, represented that those logs were part of the file. (*Id.* at 41-42.) The trial court was free

to believe their representations. In any event, Ms. Smalls testified that the supervisory logs were merely derivative of the events described in the case file. We conclude there is no merit to Mother's argument.

Next, Mother argues the trial court erred by failing to have Child's testimony recorded. The record reflects that Mother's counsel requested Child's testimony be recorded. (Notes of testimony, 11/13/13 at 3.) The trial court indicated that it was "hard to record in the back." (***Id.***) The court then spoke with Child with all counsel in the room. When the trial court was finished, it immediately went on the record and summarized the conversation with Child as follows:

> [Child] is not sure he wants to be adopted. That is very clear and that is fine. [Child] is also clear in that he is happy where he is. He doesn't want to leave where he is. That was clear, too. It is also clear that [Child] doesn't feel safe with Mom. That was very clear. He said that. And on a scale from 1 to 10, with regard to -- I use the word like, I gave him 0 to 10, where he felt where his like for Mom was, he said 5.
>
> [Child] also said he had some -- I will use the word ambivalence -- he felt 50/50 with regard to Mom. And he indicated that he would like to see Mom maybe sometimes. That was clear.
>
> That is all the Court needs.

***Id.*** at 4-5.

Following the court's summary of the conversation, Mother's counsel did not object that the court's summary was inaccurate in any way. All counsel then proceeded to make closing arguments. In his closing, Mother's

counsel raised a specific objection that Child's foster care worker was present during the interview. (**Id.** at 13.)

We note that Mother's brief inaccurately states that the trial court did not offer any explanation for not recording Child's testimony. That is patently untrue as the court noted there was a problem with recording "in the back," **i.e.**, in chambers. Based on the above, Mother was not prejudiced in any way as her counsel was present during the questioning, and did not object to any inaccuracies when the trial court summarized the conversation on the record.

Next, Mother argues the trial court erred when it refused to admit into evidence at the October 29, 2013 hearing, a CEU report dated September 13, 2013, regarding her latest negative screens for alcohol.

The statute provides that a court should not consider any effort by a parent when the remedy was initiated after the parent was given notice that the termination petition had been filed, although it may consider such efforts if they were initiated before the filing of the termination petition and continued after the petition date. **In re Z.P.**, 994 A.2d 1108, 1121 (Pa.Super. 2010). As already noted, DHS filed the petition to terminate Mother's parental rights on July 17, 2012.

Mother was re-referred to the NET for intensive treatment following a relapse which occurred just before DHS filed the petition. Due to extended illnesses suffered by a DHS social worker and the trial judge, this matter

took over 16 months to conclude after the petition was filed. At the October 29, 2013 hearing, the trial court took judicial notice of the fact that after the filing of the petition, Mother produced negative screens. The court refused to accept an exhibit proffered by Mother's counsel; however, the court repeatedly noted it was aware of the negative screens. The trial court stated:

> THE COURT: . . . [T]he Court does take judicial notice of -- I just said it. I am not going to repeat myself again.
>
> I am aware that after the filing of the Petition, [Mother] produced for the first time negative screens. The Court is aware of that, Mr. Laikin, I have that in my brain, I know that. And I know that prior to the Petition, she had positive screens.

Notes of testimony, 10/29/13 at 47.

We have stated the following with regard to the taking of judicial notice.

> Pa.R.E. 201 governs judicial notice of adjudicative facts. The rule states: "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Pa.R.E. 201(b). "A court may take judicial notice of an indisputable adjudicative fact." *Interest of D.S.*, 424 Pa. Super. 350, 622 A.2d 954, 957 (Pa. Super. 1993). A fact is indisputable if it is so well established as to be a matter of common knowledge. Judicial notice is intended to avoid the formal introduction of evidence in limited circumstances where the fact sought to be proved is so well known that evidence in support thereof is

- 16 -

> unnecessary. ***220 Partnership v. Philadelphia Elec. Co.***, 437 Pa. Super. 650, 650 A.2d 1094, 1096 (Pa. Super. 1994).
>
> > Judicial notice allows the trial court to accept into evidence indisputable facts to avoid the formality of introducing evidence to prove an incontestable issue. ***Interest of D.S.***, 622 A.2d at 957. However, the facts must be of a matter of common knowledge and derived from reliable sources "whose accuracy cannot reasonably be questioned." Pa.R.E. 201(b)(2).
>
> ***Commonwealth v. Brown***, 839 A.2d 433, 435 (Pa. Super. 2003) (emphasis omitted).

***Kinley v. Bierly***, 876 A.2d 419, 421 (Pa.Super. 2005).

We find it inappropriate for the trial court to take judicial notice of the CEU report Mother's counsel attempted to admit into evidence. However, based on the above, the trial court was certainly aware of the negative screens. The importance of those negative screens was for the trial court to determine.

Last, we turn to Mother's argument that the trial court erred when it terminated her parental rights pursuant to Section 2511(a)(1), (2), (5), and (8). When a court is faced with a petition to terminate a parent's rights to his child:

> [T]he burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a

clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa.Super. 2003) (citations omitted). On appeal, this court reviews a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa.Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Mother's parental rights were terminated pursuant to Sections 2511(a)(1), (2), (5), and (8). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d at 1117. We will address Section 2511(a)(8) and (b). This provision states as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or

more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b)** **Other** **considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

[U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007).

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d at 564. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of CYS supplied over a realistic time period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009).

With respect to the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b), we have observed:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to

> Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008-1009 (Pa.Super. 2008) (*en banc*) (citations omitted).

Instantly, the record indicates that at the time of the November 13, 2013 termination hearing, Child had been placed in DHS custody for over three years and had been out of Mother's care for over five years. Thus, the first element of Section 2511(a)(8) has been met.

The second element pertains to whether the conditions which led to Child's removal continued to exist. Initially, this case was brought to DHS' attention when DHS received and substantiated a report regarding the inadequate care of Child's older school-aged sibling. DHS implemented SCOH services and identified issues Mother needed to address to prevent the removal of the children. Specifically, Mother needed to provide adequate supervision; meet the children's daily basic needs; provide adequate, safe, and healthy housing; achieve and maintain recovery from drug and alcohol problems and verify drug free status through regular screens; complete job training and maintain employment; and stabilize mental health problems through evaluation and treatment.

Despite assistance from SCOH, Mother failed to remedy the issues and failed to comply with recommendations for mental health and substance

abuse treatment. Child was adjudicated dependent on October 28, 2008, and has never returned to Mother's care. After Child was committed to DHS, Mother's FSP objectives continued to include attending parenting classes, obtaining suitable housing, attending and completing dual diagnosis drug and alcohol and mental health treatment, and attending supervised visits. Although Mother completed parenting classes, she did not complete her other objectives.

Regarding housing, Mother continued to live with her paramour who she knew failed background clearances so that Child could not live with her. DHS never received documentation that Mother successfully completed mental health treatment. Also, Mother failed to successfully complete drug and alcohol treatment and to maintain sobriety. Mother's claim that she was due to complete drug treatment a week after her testimony on October 29, 2013, was purely speculative. In any event, Mother's efforts following the filing of the termination petition in July 2012 are irrelevant under Section 2511(a)(8).

This court has held that were a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, the second element of Section 2511(a)(8) may be deemed to be satisfied. *See In re J.F.M.*, 71 A.3d 989 (Pa.Super. 2013) (termination proper under Section 2511(a)(8), even where parent has made some progress toward resolving problems that led to removal of child; where conditions that led to

removal continue to exist after one year, statute implicitly recognizes child's life cannot be held in abeyance while parent is unable to perform actions necessary to assume parenting responsibilities); *see also In re I.J.*, 972 A.2d at 11 (appellate court cannot and will not subordinate indefinitely child's need for permanence and stability to parent's claims of progress and hope for future). Based upon the record developed, the conditions that led to Child being in placement still existed; thus, the second prong of Section 2511(a)(8) has been met.

Finally, the third prong of Section 2511(a)(8) requires DHS to prove that termination of Mother's parental rights serves the needs and welfare of Child. The trial court observed that Mother has failed to adequately address the issues that brought Child under DHS care. (Trial court opinion, 2/19/14 at 29.) During the course of this case, Mother has never had any lengthy visits with Child. (Notes of testimony, 9/17/13 at 69.) She has never had an overnight or weekend visit. (*Id.*) Ms. Smalls testified, "Mother visits, and that is a plus, but in terms of actually parenting, she hasn't been in that capacity as [Child's] Mother to parent him." (*Id.* at 68-69.) It is well established that parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002). Moreover, this court has explained:

> [W]e emphasize that we will not toll the well-being and permanency of [the child] indefinitely. *See In re S.S.W.*, 946 A.2d 726, 732 (Pa.Super. 2008) (a child's life "simply cannot be put on hold in the hope

that [a parent] will summon the ability to handle the responsibilities of parenting").

*In re C.L.G.*, 956 A.2d at 1007-1008.

Applying these standards to the facts of this case, we discern no basis for disturbing the trial court's conclusion that termination of Mother's parental rights served the needs and welfare of Child.

Next, under Section 2511(b), we inquire whether termination of Mother's parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, the trial court is not required to order a formal bonding evaluation by an expert. The trial court may terminate parental rights based on the testimony offered by social workers and caseworkers that the subject child does not share a significant bond with his biological parent and is well bonded with his foster parents. *In re A.R.M.F.*, 837 A.2d 1231 (Pa.Super. 2003).

Mother argues that Child, who is now 12 years old, does not want to be adopted. Mother also claims the trial court neglected the fact that a pre-adoptive home does not presently exist for Child. (Mother's brief at 33-34.)

- 24 -

Mother's claim that Child "expressed during his testimony that he does not want to be adopted" is not supported by the record. We have already noted that the trial court's interview with Child was not recorded; however, the trial court summarized Child's statements on the record immediately following the interview. (Notes of testimony, 11/13/13 at 4-5.) The trial court related that Child "is not sure he wants to be adopted . . . He is also clear in that he is happy where he is. He doesn't want to leave where he is . . . he doesn't feel safe with Mom." (*Id.* at 4.) Additionally, Mr. Robinson testified that Child had not said recently that he wanted to return to Mother. Rather, when the prospect of adoption was discussed with Child, he was "accepting" of it. (Notes of testimony, 1/23/13 at 53, 70, 86-87.) Similarly, Ms. Smalls testified that Child expressed to DHS and the agency in July 2013 that he wanted to be adopted, he wanted a permanent home, and he was willing to stay with the caregiver with whom he was living at the time of that hearing. (Notes of testimony, 10/29/13 at 12-13.) Clearly, the record does not support Mother's argument that Child does not want to be adopted.

Next, we turn to Mother's contention that termination of her parental rights should be denied because a pre-adoptive home does not presently exist for Child. The record indicates that Child's foster home as of the January 23, 2013 hearing was no longer considered pre-adoptive. (Notes of testimony, 1/23/13 at 71-72.) However, another pre-adoptive home was identified, and Child was subsequently moved to it. (*Id.* at 73; notes of

testimony, 11/13/13 at 4.) We note that the Adoption Act provides that a pending adoption is not necessary to the termination of parental rights by an agency such as DHS. *See* 23 Pa.C.S.A. § 2512(b) ("If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.").

Recently, the Pennsylvania Supreme Court has observed that termination can remove the impediment to a child's ability to attach to a pre-adoptive family caused by a lingering bond with a parent who has proven incapable of meeting the child's needs for care and stability. ***See In re T.S.M.***, 71 A.3d 251, 271 (Pa. 2013) (finding it was in the best interest of the children to sever unhealthy bond with Mother in order to permit them to form healthy attachments with families who could provide permanent homes). The trial court pointed out:

> Although Child is worried about Mother and even seeks to provide for Mother by gaining employment, Child's sentiments are the result of parentification, which is a failing by Mother. The Court finds that a mother-child bond does not exist. There can not be a healthy bond where, as here, Child does not feel safe with Mother.

Trial court opinion, 2/19/14 at 30.

Mother is unable to meet the Child's emotional, physical, and developmental needs, or to provide Child with a healthy and safe environment. The termination of Mother's parental rights would enable Child to find permanency and stability. Accordingly, we discern no basis for

disturbing the trial court's conclusion that termination of Mother's parental rights served the needs and welfare of Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/13/2014